UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO OBTAIN LOCATION DATA CONCERNING A CELLULAR TELEPHONE ASSIGNED CALL NUMBER (978)764-6514, WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY 310410617118706 | Mag. No. 15-MJ-6027-MPK<br><br>FILED UNDER SEAL, |

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT UNDER
18 U.S.C. § 2703(c)(1)(A)**

I, Joel T Johnson, Task Force Officer of the Drug Enforcement Administration, being duly sworn, depose and state that:

1. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), currently assigned to the DEA Portsmouth Tactical Diversion Squad ("TDS"). I have been a law enforcement officer with the Kingston, NH Police Department since 1992. I have been a TFO with DEA since January 3, 2012. As a TFO, I am a federal law enforcement officer within the meaning of Fed. R. Crim. P. 41.

3. During my employment with the Kingston Police Department and DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including heroin, oxycodone, cocaine, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Section 846, and the drug laws of the State of New

Hampshire. I have received training in the field of narcotics enforcement and investigations. I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs. I have been the Affiant on affidavits in support of arrest warrants and search warrants. I also have participated in other electronic intercept investigations. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs. I am familiar with the common appearance, packaging, texture, and smell of narcotics including heroin, oxycodone, and other illegal drugs. I have debriefed more than 100 defendants, informants and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations. Personally, I have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, and acting in an undercover capacity.

4.      Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities. Specifically, I am familiar with the manner in which narcotics traffickers use vehicles, the mails and private delivery services as well as a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. Based on my training and experience, individuals who distribute narcotics often use cellular telephones, and the text messaging capability of their cellular telephones, to arrange narcotics transactions. Individuals involved in the distribution of controlled substances frequently speak in code, either during conversations or while using the text messaging function of their cellular telephone, as a means by which to avoid detection and apprehension by law enforcement. In addition, drug traffickers may: (a) not maintain cellular

telephones for significant periods of time; (b) obtain cellular telephones with false identification information; and/or (c) obtain cellular telephones which do not require the purchaser to disclose personal identification information during the transaction. Those involved in illicit drug activity use such methods to avoid discovery by law enforcement.

5. I make this affidavit, Pursuant to Federal Rule of Criminal Procedure 41, and Title 18, United States Code, Section 2703(c)(1)(A), authorizing agents of the DEA to ascertain the physical location of the telephone with the assigned call number (978) 764-6514, with International Mobile Subscriber Identity IMSI 310410617118706, subscribed in the name of LOCUS COMMUNICATIONS, 111 Sylvan Ave., Englewood Cliffs, NJ, with service provided by AT&T (the "TARGET CELLPHONE"), including, but not limited to, E-911 Phase II data or other precise location information concerning the TARGET CELLPHONE ("Requested Information"), for a period of 30 days. The TARGET CELLPHONE is further described in Attachment A, and the REQUESTED INFORMATION—the information to be seized—is further described in Attachment B.

6. In my training and experience, I have also learned that ,when sending or receiving a communication, a mobile phone broadcasts signals to the cell tower that is routing its communication. Law enforcement is capable of monitoring these non-content signals when mobile phones initiate or receive calls and may also initiate a communication with mobile phones in order to cause them to emit such signals. By collecting these non-content signals, law enforcement can relatively precisely determine the location of the mobile telephone itself.

7. I am the case agent and have personally participated in the investigation set forth below. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses, including information

3

provided by the TDS and other law enforcement agencies. In preparing this affidavit, I have prepared reports and reviewed reports prepared by other investigators regarding witness interviews, surveillance and other investigative efforts regarding this investigation. In addition, I have discussed this investigation with other officers involved in the case. Through my conversations with other officers and my analysis of reports prepared by other officers, I am familiar with all aspects of this investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another DEA agent, law enforcement officer, or witness who had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Because this affidavit is submitted for the limited purpose of securing a warrant authorizing the acquisition of the Requested Information, it does not contain all of the information gathered during this investigation; rather it contains information that I believe is sufficient to support my request. I relied only on facts herein set forth in reaching my conclusion that the requested warrant should be issued.

8. Based on my training and experience, and the facts set forth in this affidavit, there is probable cause to believe that the Requested Information will constitute or lead to evidence of offenses involving distribution of narcotics, conspiracy to distribute narcotics, and use of a communication facility in furtherance of narcotics offenses, in violation of Title 21, United States Codes, Sections 841(a)(1), 846, and 843(b), ("TARGET OFFENSES"), as well as the identification of individuals who are engaged in the commission of these offenses.

9. For the reasons set out in this affidavit, there is probable cause to believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed by an individual whose first and last name are unknown ("FNU LNU"), Juan ROJAS,

Mara MORILLO, Franklyn MORILLO, and others known and unknown. Further, there is probable cause to believe that FNU LNU is using the TARGET CELLPHONE to commit the TARGET OFFENSES and that the REQUESTED INFORMATION will constitute evidence of these crimes and will lead to the identification and location of those who committed them. The precise location information requested by the proposed warrant will assist investigating agents to locate and identify FNU LNU, among other investigative avenues.

## OVERVIEW OF THE INVESTIGATION

10.     Since September of 2014, other law enforcement officers and I have been conducting an investigation of a drug trafficking organization that is operating in Massachusetts and New Hampshire. Mara MORILLO is one of the targets. Information from cooperating individuals and intercepted telephone calls indicates that MORILLO, who resides in Haverhill, MA, is distributing oxycodone and other controlled substances, including cocaine. Together with her ex-husband Franklyn MORILLO, Mara MORILLO re-distributes oxycodone and cocaine using a series of "runners" in Massachusetts and New Hampshire.

11.     On May 28, 2015, I was granted authorization by Judge Paul Barbadoro of the United States Federal Court District of New Hampshire, for a Title-III wire intercept for three telephone numbers: Telephone Target #1 (978-891-2452), Telephone Target #2 (978-620-6677) and Telephone Target #3 (978-376-4338). These phones were used by Mara MORILLO to assist her drug trafficking operation. As part of this investigation I have identified sources of supply and customers of the MORILLO drug trafficking organization.

12.     One of the sources of supply for the MORILLO drug trafficking organization is an individual by the name of Juan ROJAS. I believe that ROJAS is the user of telephone number 978-398-7540, based on information gathered from intercepted calls of Mara MORILLO and

based on ROJAS activities during DEA surveillance in May and June of 2015. In addition, based, in part, on intercepted conversations between Mara MORILLO, using Target Telephone #1, and ROJAS, I believe that ROJAS is supplying quantities of drugs to Mara MORILLO.

13. On June 22, 2015, I was granted authorization by Judge Paul Barbadoro of the United State Federal Court District of New Hampshire, for a Title-III wire intercept for three telephone numbers: Telephone Target #3 (978-376-4338), Telephone Target #4 (978-872-2609), which is used by Mara MORILLO, and Telephone Target #5 (978-398-7540), which is used by Juan ROJAS. During the interception of the calls of Telephone Target #5 (the ROJAS phone), I became aware of another individual, FNU LNU, who uses TARGET CELLPHONE, with the telephone number 978-764-6514, subscribed in the name of LOCUS COMMUNINCATIONS, 111 Sylvan Ave, Englewood Cliffs, NJ.

14. On June 25, 2015, ROJAS made and received a series of calls with Mara MORILLO and the TARGET CELLPHONE to broker a cocaine deal in which the user of the TARGET CELLPHONE would supply cocaine to ROJAS, and ROJAS, in turn, would supply MORILLO. At approximately 12:52 pm on that date, ROJAS placed an outgoing call to the TARGET CELLPHONE. During the call, ROJAS and FNU LNU had the following conversation:

ROJAS: The woman hit me up that she supposedly needs 100 dollars of those. Cash right away.

FNU LNU: Oh, well, I don't – [Voices overlap].

ROJAS: You still – [Voices overlap].

FNU LNU: You tell me – [Voices overlap].

ROJAS: You still working though, right?

6

| | |
|---|---|
| FNU LNU: | That what? No, no – [Voices overlap]. |
| ROJAS: | You still – [Voices overlap]. |
| FNU LNU: | I'm getting out right now, as we speak. I'm getting in my car right now. |
| ROJAS: | So, that's still – [Voices overlap]. |
| FNU LNU: | I can get you that like in35 minu – [Voices overlap]. |
| ROJAS: | That is loose, loose, loose [sic] still? |
| FNU LNU: | Like that, loose. Uh-huh. |
| ROJAS: | Let me hit her up. I'll call you back. |
| FNU LNU: | You know that shit is good. |
| ROJAS: | Alright. I'll call you back now. Hold on. |
| FNU LNU: | Alright, bye. |

15. Based on my training and experience, I believe that on this call, ROJAS was telling his supplier, FNU LNU, that Mara MORILLO ("the woman") wanted 100 grams of cocaine and needed it right away. ROJAS then verified that FNU LNU's product was "loose," meaning that it was not in rock-like form. Subsequently, when FNU LNU told ROJAS that "that shit is good," I believe FNU LNU was communicating to ROJAS that the cocaine FNU LNU would be supplying was of good quality.

16. Immediately following this phone call, at approximately 12:53 pm, ROJAS placed a brief call to Mara MORILLO at Telephone Target #4 (978-872-2609). During that call Mara MORILLO and ROJAS had the following conversation:

| | |
|---|---|
| ROJAS: | The guy is on his way over here. The loose – Did you hear? The yellow one, that good one. |

| | |
|---|---|
| MORILLO: | Yes. |
| ROJAS: | The one that comes loose. Did you hear? |
| MORILLO: | Okay. |
| ROJAS: | Alright. |
| MORILLO: | In how long? |

17. Based upon my training and experience, I believe that on this call, ROJAS was confirming with MORILLO that she still wanted the cocaine and wanted it loose.

18. Immediately following the call with MORILLO, at approximately 12:53 pm, ROJAS placed an outgoing call to the TARGET CELLPHONE. During the call, FNU LNU and ROJAS had the following conversation:

| | |
|---|---|
| FNU LNU: | Talk to me. |
| ROJAS: | She told me it's all good. |
| FNU LNU: | All good. |
| ROJAS: | Uh, are you, um – How far are you? Do you have to come from Boston? |
| FNU LNU: | No, I'm right here in Woburn. I'll be there, like – I'll be up there in like, like, fucking, half an hour, 45 minutes. Something like that. |
| ROJAS: | Alright. I'm going to stay over here then. I'm going to wait for you. |
| FNU LNU: | Stay there on Ja [possibly Jackson Street]. Uh, yeah, even less than that. Let me try to get up there and shit. |
| ROJAS: | Should I stay by your house? |
| FNU LNU: | No, no, no. I gotta – It's somewhere else. But I could get it real quick. |
| ROJAS: | Alright. |
| FNU LNU: | I just gotta get it right away. Hey, what happened with the little things? |

ROJAS: No, it's – The guy hasn't called me. Things are slow, and I'm not going to give – them – not going to be giving stuff like that now. I don't want to take a risk.

FNU LNU: No, no, no, no, no.

ROJAS: Nah, that's cash. Everything I'm doing cash right now.

FNU LNU: No, well, that's good. So, I'll call you. I'm getting out right now, so I'm leaving.

ROJAS: Alright.

FNU LNU: Alright.

19. Based on my training and experience, I believe that on this call, ROJAS was confirming with FNU LNU that MORILLO wanted the product previously discussed. In addition, FNU LNU asked ROJAS about "the little things," which, based on my training and experience, including other conversations between targets in this investigation, I believe to be a reference to oxycodone pills. In his response to this question, I believe ROJAS was telling FNU LNU that business was slow and that he (ROJAS) would only do cash transactions for the pills, not credit.

20. At approximately 1:21 pm, ROJAS placed and outgoing call to the TARGET CELLPHONE. On that call, ROJAS and FNU LNU had the following conversation:

FNU LNU: Just got home right now. Give me like 10. Give me like 15 minutes, so – [Call breaks] [unintelligible].

ROJAS: Uh, I'm here on Essex and Jackson.

FNU LNU: All good. No, so we can meet – [Unintelligible].

ROJAS: Where?

| | |
|---|---|
| FNU LNU: | The – [Unintelligible]. |
| ROJAS: | Nigga, you're like breaking up or something. |
| FNU LNU: | By the mother-in-law's house. |
| ROJAS: | Oh, well, I'm going there now, then. |
| FNU LNU: | No, don't go. [Unintelligible] I'm not there yet. I just got home right now. Hold on. |
| ROJAS: | Oh, alright. |
| FNU LNU: | Give me, like, say like, 15 minutes. I'll be right there in like 10, 15 minutes. |
| ROJAS: | Alright. |
| FNU LNU: | Okay. |

21.     Based upon my training and experience, I believe that on this call, ROJAS was confirming the meeting time and location with FNU LNU. Furthermore, based on references to ROJAS's location during this time, I believe the meeting with FNU LNU to have been within the District of Massachusetts, and that FNU LNU's use of the TARGET CELLPHONE was also within the District of Massachusetts.

22.     After confirming the meeting place, ROJAS sent an outgoing text to MORILLO at approximately 1:24 pm. It read:

| | |
|---|---|
| ROJAS: | Leaving law in 10 [sic] |

23.     At approximately 1:54 pm, ROJAS sent another outgoing text to MORILLO. It read:

| | |
|---|---|
| ROJAS: | In pulling up. [sic] |

24. Based upon my training and experience, I believe that ROJAS sent these messages to MORILLO after he obtained the cocaine from the user of the TARGET CELLPHONE, to keep her apprised of his whereabouts. I believe "law" to be a reference to Lawrence, Massachusetts.

25. At approximately 2:11 pm, while ROJAS was at MORILLO's house, ROJAS placed an outgoing call to the TARGET CELLPHONE. The following conversation was intercepted from that call:

| | |
|---|---|
| ROJAS: | [Aside] Doesn't it smell a little bit like – |
| MORILLO: | [Background] Yes. |
| ROJAS: | [Aside] Like acetone? |
| MORILLO: | [Background] [Unintelligible]. |
| ROJAS: | [Aside] Look – oh, it numbed me, yeah. |
| ROJAS: | But that doesn't look like the other stuff man. That smells like acetone. That thing – |
| FNU LNU: | Man, that thing is straight, man. There's nothing like that. Tell her to put it in the – |
| ROJAS: | To throw it in? |
| FNU LNU: | If she wants to throw it in, whatever, to throw it in – [Voices overlap]. |
| ROJAS: | And it has like the little thing, like, like, somebody put it like a flat. You know, like flatten – |
| FNU LNU: | Yeah, because of where it came in. Because it came in a flat thing. You understand? |
| ROJAS: | What was that? |

| | |
|---|---|
| FNU LNU: | That it came in a flat thing. You know what I mean? |
| ROJAS: | Oh, yeah. Okay. |
| FNU LNU: | It came in like a cardboard, like a [sic] ironed down thing like that, man. [Voices overlap]. |
| ROJAS: | Yeah. |
| FNU LNU: | But, the thing is, that since that thing is not, – is not, - is not anything. You know? Mashed up. You know what I'm saying? |
| ROJAS: | Because, because of the thing. You know. Maybe of where it comes in and stuff. It gets a little bit hard. [Unintelligible]. [Voices overlap]. |
| ROJAS: | Yes, yes. No, it already numbed my mouth. It numbed my mouth more than – Fuck, yeah. |
| FNU LNU: | What was that? |
| ROJAS: | That, no. That – it's – that, it just smells different, but is good. |
| FNU LNU: | I'm telling you. But, man, that thing comes in – Listen, that thing – you – I've told you more than five hundred times. That thing comes straight to me from over there. From – you already know from where, from down there. That doesn't even come from this country, nigga. I'm telling you, that comes from – [Unintelligible]. [Voices overlap]. |
| ROJAS: | No, I know. But, you know, people panic. Uh-huh. |
| FNU LNU: | No, of course. No, that's why I'm telling you for them to throw it in to – [Voices overlap]. |
| ROJAS: | [Aside] [Unintelligible]. |

| | |
|---|---|
| FNU LNU: | If they want to throw it in, whatever she wants to do. To sniff it, or whatever. |
| ROJAS: | Alright. |
| FNU LNU: | Alright, bye. |

26. Based upon my training and experience, I believe that on this call, ROJAS and FNU LNU, the user of the TARGET CELLPHONE, are discussing the quality of the cocaine and the cutting agent, acetone, that FNU LNU used. I believe that the references to the cocaine numbing ROJAS's mouth to mean that the quality of the cocaine was good. FNU LNU's statements about the product coming from "down there" lead me to believe that FNU LNU may be getting the cocaine that originated outside the United States. I believe ROJAS' comment about people panicking is a reference to the negative reaction he is concerned that his customers will have if he sells them cocaine that looks or smells different from his normal product.

27. At approximately 2:33 pm, ROJAS placed another outgoing call to the TARGET CELLPHONE. On that call, the following conversation was intercepted:

| | |
|---|---|
| ROJAS: | Yeah, that's all set. I left that for him there. I took the money. I told her, "Well, if anything, if the guy doesn't like it, you let me know, man." Is that these people – it's a new customer. You know what I'm saying? |
| FNU LNU: | Yeah. [Voices overlap]. |
| ROJAS: | It's fine. It's that he's – but nothing. He gets kind of picky, you know? [Unintelligible]. |
| FNU LNU: | Yeah. |
| ROJAS: | I told her, "Well, that's good so, you know. Tell him if he wants to try it or whatever, or if he just wants it to press it or whatever." You understand? |

13

| | |
|---|---|
| FNU LNU: | Mm-hmm. |
| ROJAS: | But I know he's gonna do something with it, you know. That's why he wants it, like, that good. |
| FNU LNU: | Oh, forget about it. That's not going to be – if anything I have more of that so you can see is the same shit. [Unintelligible]. It is – is the same fucking shit. |
| ROJAS: | It's all good. I got that shit here. Um, um, where you wanna – oh, I can't meet you right now. If you want to come to the house, come to the house. |
| FNU LNU: | Um, possibly. [Voices overlap]. |
| ROJAS: | I gotta – [Voices overlap]. |
| FNU LNU: | Probably like in 20 minutes, half an hour. |
| ROJAS: | Alright, 'cause I gotta stay with my son and shit that's why. |
| FNU LNU: | Oh, you gotta be with him? Is all good. [Voices overlap]. |
| ROJAS: | Yeah. [Voices overlap]. |
| FNU LNU: | I'll hit you up when I go up there. |
| ROJAS: | Alright. |
| FNU LNU: | Alright, bye. |

28.     Based upon my training and experience, I believe that on this call, ROJAS is telling the user of the TARGET CELLPHONE that ROJAS sold the cocaine and left it with MORILLO. Furthermore, MORILLO has a new customer for the cocaine, but ROJAS knows that the MORILLOs may do something with the cocaine. Based on my training and experience, and my knowledge of the MORILLO drug trafficking organization, I believe the references to "do[ing] something with it" refer to the potential that the MORILLOs may add their own cutting

agent to the drug to prepare it in a manner more familiar to their customers. FNU LNU stated he had more of the "same shit" and that it may be the same product FNU LNU sold to ROJAS before. Additionally, I believe that ROJAS had the money from the sale and that the two were discussing how or where to meet so that ROJAS can pay FNU LNU.

## THE RELEVANT TECHNOLOGY

29. I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

## AUTHORIZATION REQUEST

30. Based on the foregoing, there is probable cause to believe that the Requested Information will lead to evidence regarding the activities described above. The Requested Information is necessary to determine the location of FNU LNU so that law enforcement agents can conduct physical surveillance of FNU LNU, to discover FNU LNU's identity, methods of

operation, and stash locations and to determine his closest associates. Accordingly, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.

    31.    I also request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay any required notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705, including giving that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic information, there is reasonable necessity for the seizure, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

    32.    In executing the warrant, investigators may both obtain the information in Attachment B from AT&T and may collect and examine:

    a. radio signals emitted by the TARGET CELLPHONE for the purpose of communicating with mobile infrastructure, including towers that route and connect individual communications; and

    b. radio signals emitted by the TARGET CELLPHONE in response to signals sent to the Target Mobile Phone by the investigators.

In executing the search warrant, the government will not collect the content of any communications.

33.    I also request that, pursuant to 18 U.S.C. § 2705(b), the Court order AT&T not to notify any person (including the subscriber to the TARGET CELLPHONE) of the existence of this application, the warrant, or the execution of the warrant unless and until authorized to do so by the Court. Such an order is justified because there is cause to believe that providing immediate notification of the execution of the requested warrant may have an adverse result. Providing prior notice to the subscriber or user of the TARGET CELLPHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give FNU LNU an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee.

34.    The execution of the requested warrant will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. § 2510). To the extent that the order authorizes the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A).

35.    WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue a warrant authorizing agents of DEA to obtain the Requested Information for a period of thirty (30) days.

36.    IT IS FURTHER REQUESTED that the Court direct AT&T to assist agents of the DEA by providing all information, facilities, and technical assistance needed to ascertain the Requested Information, and further direct AT&T, the service provider for the TARGET CELLPHONE, to initiate a signal to determine the location of the TARGET CELLPHONE on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the

user of the TARGET CELLPHONE, for a period of thirty (30) days.  Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

37.  IT IS FURTHER REQUESTED that the Court authorize execution of the order at any time of day or night, due to the potential need to locate the TARGET CELLPHONE outside of daytime hours.

38.  IT IS FURTHER REQUESTED that the order and this Affirmation, as it reveals an ongoing investigation, be sealed until further order of the Court, to avoid premature disclosure of the investigation, guard against flight, and better ensure the safety of agents and others, except that working copies may be served on Special Agents and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, and to AT&T as necessary to effectuate the Court's order.

_____
Joel Johnson
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on July 2, 2015.

_____
Hon. Page Kelley
United States Magistrate Judge



## ATTACHMENT A

Information about the location of the mobile phone assigned the physical location of the telephone with the assigned call number (978) 764-6514, with International Mobile Subscriber Identity IMSI 310410617118706, subscribed in the name of LOCUS COMMUNICATIONS, 111 Sylvan Ave., Englewood Cliffs, NJ, with service provided by AT&T (the "TARGET CELLPHONE").

## ATTACHMENT B

All information about the location of the TARGET CELLPHONE described in Attachment A for a period of thirty days, during all times of day and night, including:

1. E-911 Phase II data;
2. GPS data;
3. latitude-longitude data;
4. other precise location information;
5. data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Mobile Phone; and

This warrant does not authorize the collection of any content of any communications.

AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Information about the location of the Target Mobile Phone unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the Target Mobile Phone on AT&T's network, and at such intervals and times directed by the government. The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of Information about the location of the Target Mobile Phone. *See* 18 U.S.C. § 3103a(b)(2)

AT&T shall not disclose the existence of the search warrant to the listed subscriber or to any other person, unless and until otherwise authorized to do so by the Court. *See* 18 U.S.C. § 2705(b).